**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Pederzolli,<br><br>   Plaintiff,<br><br>v.<br><br>Commissioner of Social Security Administration,<br><br>   Defendant. | No. CV-17-04705-PHX-DWL<br><br>**ORDER** |

**INTRODUCTION**

Plaintiff Robert Pederzolli ("Pederzolli") seeks review under 42 U.S.C. § 405(g) of the final decision of the Acting Commissioner of Social Security ("Commissioner"), which denied his application for disability benefits and supplemental security income. For the following reasons, the Court finds that the administrative law judge's ("ALJ") decision was based on reversible legal error and remands for further proceedings.

Pederzolli, a 40-year-old male who previously worked as a swimming pool servicer, alleges he became disabled in December 2007. In September 2011, he filed an application for disability benefits. (A.R. 165-166.) The claim was denied initially on February 2, 2012 (A.R. 70) and again upon reconsideration on October 31, 2012 (A.R. 103). Pederzolli then filed a written request for hearing on November 8, 2012. (A.R. 121-122.) On May 9, 2013, he appeared and testified at a hearing at which an impartial vocational expert also appeared and testified. (A.R. 36-69.) On June 28, 2013, the ALJ issued a decision that Pederzolli was not disabled within the meaning of the Social Security Act. (A.R. 19-35.) On January

16, 2015, the Appeals Council denied Pederzolli's request for review (A.R. 1-7.)

Pederzolli sought review in this Court on March 16, 2015. (A.R. 1768.) In response, the Commissioner conceded the ALJ had committed errors that required a remand for further proceedings. (Case No. 15-cv-472-PHX-DKD, Doc. 21.) Accordingly, this Court vacated the ALJ's decision and remanded. (A.R. 1771-1775.) The ALJ conducted a new hearing on October 13, 2016 (A.R. 1713-1734) and issued a decision again determining that Pederzolli wasn't disabled (A.R. 1690-1712). Pederzolli requested review of the ALJ's decision, but the Appeals Council denied review on October 23, 2017. (A.R. 1683-1689.) At that point, the ALJ's decision became the Commissioner's final decision.

## **LEGAL STANDARD**

The Court addresses only the issues raised by the claimant in the appeal from the ALJ's decision. *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001), *as amended on reh'g* (Aug. 9, 2001). The Court should uphold the ALJ's decision "unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Id.* Put another way, "[i]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The Court should uphold the ALJ's decision "[w]here evidence is susceptible to more than one rational interpretation," but the Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Id.* (citations and internal quotation marks omitted).

"[H]armless error principles apply in the Social Security Act context." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). "[A]n ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination." *Id.* (citations and internal quotation marks omitted). The Court must "look at the record as a whole to determine

whether the error alters the outcome of the case." *Id.* Importantly, however, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ. *Id.* at 1121.

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, and the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity ("RFC") and determines whether the claimant is capable of performing past relevant work. *Id.* § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, which addresses whether the claimant can perform any other work based on the claimant's RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled.

**BACKGROUND**

At step one, the ALJ determined that Pederzolli met the insured status requirements of the Social Security Act through December 31, 2012 and had not engaged in substantial gainful activity since December 17, 2007. (A.R. 1695-1696.) At step two, the ALJ found that Pederzolli had the following severe impairment: lumbar disc herniation with epidural fibrosis. (A.R. 1696.) The ALJ acknowledged the record also contained evidence of anxiety and depression but found these were not severe impairments. (*Id.*) At step three,

the ALJ determined that Pederzolli didn't have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (*Id.*) At step four, the ALJ determined that Pederzolli had the RFC to perform sedentary work, except that "he [1] is limited to a maximum lifting and carrying capacity of 10 pounds frequently; [2] can stand and/or walk with normal breaks for a total of 2 out of 8 hours; and [3] [can] sit with normal breaks for more than 6 hours in an 8 hour workday." (A.R. 1696-1704.) Further, the ALJ determined that Pederzolli "is unlimited in pushing and pulling as long as it is within the weight limits specified for lifting and carrying" and "can frequently balance, kneel and crouch as well as occasionally climb ramps, stairs, ladders, ropes or scaffolds." (*Id.*) Also, the ALJ determined Pederzolli can occasionally stoop and crawl and should avoid concentrated exposure to hazards. (*Id.*) The ALJ found Pederzolli wasn't capable of performing his past relevant work but could perform the occupations of microfilming document preparer, addresser, and surveillance systems monitor. (A.R. 1704-1706.)

In his opening brief, Pederzolli argues the ALJ erred by: (1) improperly weighing the opinions of Dr. McLean, Mary Hymen, and Dr. Grove; (2) failing to provide specific, clear and convincing reasons to reject his symptom testimony; (3) not allowing him to cross-examine agency consultants and not requiring the vocational expert to provide the materials on which he relied; and (4) determining the Commissioner satisfied her Step 5 burden. Pederzolli asks the Court to remand for a computation of benefits. (Doc. 19.)

For the reasons that follow, the Court agrees the ALJ committed reversible legal error when weighing Dr. McLean's medical opinions and incorporating those opinions into the RFC. However, the Court disagrees with Pederzolli's other assignments of error.

**DISCUSSION**

I. <u>Whether The ALJ Improperly Weighed The Opinion Evidence</u>

    A. **Dr. McLean And Mary Hymen**

        1. <u>The Opinions</u>

Dr. McLean is Pederzolli's treating orthopedic surgeon. On June 8, 2011, Dr.

McLean referred Pederzolli to Mary Hymen, a registered and licensed occupational therapist, for a functional capacity evaluation ("FCE"). (A.R. 1222.) Hymen conducted the FCE on June 28, 2011 and determined that Pederzolli was able to lift 20 pounds from floor to waist occasionally, 15 pounds from waist to overhead occasionally, push 72 pounds occasionally, and pull 74 pounds occasionally. (A.R. 346-353.) Further, Hymen determined that Pederzolli could only sit for approximately 20 minutes, stand for approximately 20 minutes, and walk for approximately 15 minutes at a time. (*Id.*) Thus, Hymen concluded, Pederzolli "needs a position that allows movement, change of position often." (*Id.*)

Dr. McLean reviewed Hymen's conclusions regarding Pederzolli's FCE on July 20, 2011. (A.R. 1222-1224). He also conducted an independent examination to evaluate Pederzolli's work capacities and limitations. (A.R. 1226.) Dr. McLean's examination determined that Pederzolli could lift and carry a maximum of "10-25 pounds occasionally, more frequently 10 pounds," and push/pull 50-70 pounds. (A.R. 1223.) Additionally, Dr. McLean determined that Pederzolli could work 8 hours a day, 40 hours a week, and could stand 4-6 hours a day and sit 6-8 hours a day. (A.R. 1226.) However, Dr. McLean opined that Pederzolli would have to change position every 30-60 minutes. (A.R. 1223.) Dr. McLean explained that Pederzolli should "avoid any repetitive bending, stooping or squatting, overhead work or working on uneven ground or climbing." (*Id.*) Dr. McLean concluded his opinion by noting: "With respect to [Pederzolli's] work restrictions, again, it is consistent with the FCE." (*Id.*)

2. The ALJ's Consideration

The ALJ gave "[s]ignificant weight" to Dr. McLean's medical opinions and adopted his opinion regarding Pederzolli's sitting, standing, and walking limitations. (A.R. 1702.) The ALJ did not, however, address Dr. McLean's opinion that Pederzolli should "avoid any repetitive bending, stooping or squatting, overhead work or working on uneven ground or climbing." (*Id.*)

The ALJ gave "[s]ome weight" to the FCE performed by Hymen. (A.R. 1702-

1703.) She determined that Hymen's "conclusion that [Pederzolli] is limited to only occasional sitting in an 8-hour workday is not consistent with most of the physical opinions of record. . . ." (*Id.*) Further, the ALJ noted the authors of the other opinions regarding Pederzolli's limitations were acceptable medical sources, unlike Hymen. (*Id.*) Despite discounting Hymen's opinion, the ALJ considered the limitations expressed by Hymen and added a sit/stand option at will into Pederzolli's RFC. (*Id.*)

3. Analysis

Pederzolli argues the ALJ erred in four ways when weighing Dr. McLean and Mary Hymen's opinions. The first and second arguments are predicated on Pederzolli's assertion that Dr. McLean endorsed the sitting, standing, and walking limitations in Hymen's FCE by noting in his medical opinion: "With respect to [Pederzolli's] work restrictions, again, it is consistent with the FCE." First, Pederzolli argues the ALJ should have found him disabled because the vocational expert testified there are no occupations that could be performed with the limitations allegedly endorsed by Dr. McLean. Second, Pederzolli contends that, because Dr. McLean endorsed the sitting, standing, and walking limitations in Hymen's FCE, but also provided conflicting limitations, the ALJ erred by not resolving the conflict. (Doc. 19 at 13-14; Doc. 29 at 2-5.)

These arguments are without merit. Dr. McLean didn't endorse all of the limitations determined by Hymen; in fact, he disagreed with the extent of those limitations. This is evident because Dr. McLean conducted his own examination of Pederzolli and concluded that Pederzolli was subject to different limitations than those identified by Hymen. Dr. McLean thus didn't endorse every limitation identified by Hymen when he said the work restrictions he was identifying are "consistent with the FCE." The only other mention in Dr. McLean's medical opinion of the FCE is that "[Pederzolli's] FCE did find that he is capable of working in sedentary to light capacity." (A.R. 1223.) Indeed, Dr. McLean's medical opinion *is* consistent with Hymen's FCE, to the extent both determined Pederzolli can perform sedentary work. Therefore, the ALJ's decision to afford "[s]ignificant weight" to Dr. McLean's medical opinion didn't preordain a disability finding, nor was there an

internal conflict within Dr. McLean's medical opinion regarding Pederzolli's limitations that the ALJ was obligated to resolve.

Pederzolli next argues the ALJ erred by rejecting Hymen's opinion because she was not an acceptable medical source. The Court disagrees. The ALJ rejected Hymen's opinion that Pederzolli "is limited to only occasional sitting in an 8-hour workday" because it "is not consistent with most of the physical opinions of record, including Dr. McLean . . . the State agency doctors, and Dr. McPhee, the consultative examiner." (A.R. 1703.) In other words, although the ALJ mentioned that Hymen wasn't an "acceptable medical source," she didn't reject Hymen's opinions on that basis—instead, she rejected them because they conflicted with the other medical opinions in the record.

This was a valid basis for rejection. Because Hymen is an occupational therapist, she is not considered an "acceptable medical source." *Seaman v. Berryhill*, 2017 WL 3879084, *5 (D. Alaska 2017) ("'[O]nly licensed physicians and certain qualified specialists are considered acceptable medical sources.' Other health care providers, such as occupational therapists, are considered 'other sources' . . . .") (citations omitted). Accordingly, under the rules applicable at the time of Pederzolli's hearing,[1] the ALJ was only required to provide germane reasons for discounting Hymen's opinion. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citation and internal quotation marks omitted). And inconsistency between a medical opinion from an acceptable source and the opinion of a non-acceptable source is a germane reason to give less weight to the opinion of the other source. *Molina*, 674 F.3d at 1112 (citations omitted) ("Wheelwright's opinion was inconsistent with that of Dr. Yost . . . whose opinion was. . . entitled to greater weight. . . . Accordingly, the ALJ did not err in discounting Wheelwright's opinion where it conflicted with Dr. Yost's evaluation.").

Finally, Pederzolli argues the ALJ erred because she failed to adopt some of the

---

[1] "[F]or all claims filed on or after March 27, 2017, the Rules in 20 C.F.R. § 404.1520c (not § 404.1527) for determining the persuasiveness of the medical evidence shall apply. . . ." *Boissiere v. Berryhill*, 2017 WL 3741261, *8 n.8 (C.D. Cal. 2017). Because Pederzolli's applications for benefits were filed prior to March 27, 2017, these new regulations did not apply at the time the ALJ issued her decision.

1 limitations that were expressed in Dr. McLean's opinion. Specifically, Pederzolli contends Dr. McLean recommended no repetitive "bending, squatting, overhead work or working on uneven ground" and restricted Pederzolli to "seldom" stooping, yet the ALJ didn't incorporate these limitations into the RFC. (Doc. 19 at 13-14, 20; Doc. 29 at 2-5.)

An ALJ must provide reasons for rejecting each opined limitation in a medical opinion when determining a claimant's RFC. *Betts v. Colvin*, 531 Fed. App'x 799, 800 (9th Cir. 2013) ("Though the ALJ said he was according 'the greatest weight' to Dr. Van Eerd's opinion, the ALJ's finding regarding Betts' residual functional capacity (RFC) failed to take into account certain limitations identified by Dr. Van Eerd. . . . The ALJ provided no reasons for disregarding aspects of Dr. Van Eerd's opinion, so we must reverse."); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) ("[A]n RFC that fails to take into account a claimant's limitations is defective."); SSR 96-8p, *7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). Here, the ALJ didn't do so. Thus, the ALJ erred by rejecting the opined limitations of Dr. McLean without providing reasons.

Still, an error doesn't warrant reversal if it's harmless. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006). An error is harmless if it's "inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115 (citations omitted). "In other words, harmless error occurs when the record shows that 'the ALJ would have reached the same result absent the error' or 'it was clear [the errors] did not alter the ALJ's decision.'" *Nelson v. Colvin*, 2013 WL 4010860, *2 (D. Ariz. 2013) (quoting *Molina*, 674 F.3d at 1115).

On the one hand, the ALJ's failure to provide reasons for rejecting Dr. McLean's medical opinions regarding Pederzolli's bending, squatting, and stooping limitations was harmless. The ALJ ultimately determined Pederzolli could perform the occupations of microfilming document preparer, addresser, and surveillance systems monitor. None of these occupations involves any bending, squatting, or stooping. Dictionary of Occupation

Titles ("DOT") DOT 249.587-018, *available at* 1991 WL 672349; 209.587-010, *available at* 1991 WL 671797; DOT 379.367-010, *available at* 1991 WL 673244.[2]

On the other hand, the ALJ's failure to provide reasons for rejecting Dr. McLean's opined limitations regarding Pederzolli's ability to perform "overhead work" and "work[] on uneven ground" wasn't harmless. This is because the DOT doesn't address whether particular occupations involve overhead work or work on uneven ground. Although the Court is skeptical that the three occupations at issue in this case (microfilming document preparer, addresser, and surveillance systems monitor) involve working on uneven ground, it's possible these occupations include repetitive overhead work. Thus, the Court cannot conclude the ALJ's error was "inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115. On remand, the ALJ must (1) provide reasons to reject Dr. McLean's opined limitations concerning Pederzolli's ability to perform repetitive overhead work and work on uneven ground and/or (2) determine whether the occupations of microfilming document preparer, addresser, and surveillance systems monitor require repetitive overhead work or work on uneven ground.

B. **Dr. Grove**

1. The Opinion

Dr. Grove is Pederzolli's treating pain management physician. Pederzolli contends that Dr. Grove treated him on more than 60 separate occasions from 2012 to 2016. (Doc.

---

[2] Social Security terminology doesn't include the terms "bending" or "squatting" as postural-manipulative impairments that must be included in an RFC. *See, e.g.,* SSR 85-15, *available at* 1985 WL 56857, *7. However, there are three types of postural-manipulative impairments recognized in the Commissioner's policy rulings that include "bending." *Van Banh v. Colvin*, 2015 WL 5020670, *3 (C.D. Cal. 2015). These are "stooping," (bending the body downward and forward by bending the spine at the waist), "kneeling" (bending the legs at the knees to come to rest on one or both knees), and "crouching" (bending the body downward and forward by bending both the legs and spine). SSR 85-15, *available at* 1985 WL 56857, *7. And although "squatting" is not a postural-manipulative impairment recognized in Social Security terminology, "crouching" is recognized, and "crouching" is "essentially synonymous" with "squatting." *Chavez v. Astrue*, 699 F. Supp. 2d 1125, 1133 n.5 (C.D. Cal. 2009) (citations omitted) ("In assessing plaintiff's RFC, the ALJ, in accordance with Social Security terminology . . . used the term 'crouch' rather than 'squat.' However, this is inconsequential since the terms are essentially synonymous."). None of the occupations the ALJ determined Pederzolli could perform involve any "stooping," "kneeling," or "crouching."

19 at 17.) In March 2012, Dr. Grove opined that Pederzolli could lift and carry more than 10 pounds, but fewer than 15 pounds. (A.R. 1107.) He determined that, in an eight-hour workday, Pederzolli could sit fewer than two hours and stand and/or walk fewer than two hours. (*Id.*) Dr. Grove also determined that Pederzolli couldn't ever bend, crawl, climb, stoop, crouch, or kneel. (*Id.*) Further, he opined that Pederzolli's pain prevented him from sustaining work activity for eight hours a day, five days a week. (*Id.*)

In April 2013, Dr. Grove made similar findings and also found it was medically necessary for Pederzolli to alternate between sitting, standing, and walking every 1-20 minutes, and for every position change, Pederzolli would need to rest for 10-15 minutes. (A.R. 1618.) He opined that Pederzolli suffered from pain, fatigue, dizziness, and headaches to a "severe" degree, such that Pederzolli would be off-task more than 21% of the day, and that Pederzolli would miss more than 6 days per month due to his impairments.

In October 2016, Dr. Grove again evaluated Pederzolli. (A.R. 2141-2142.) Dr. Grove made the same findings as before, except he determined Pederzolli was more limited in his ability to lift and carry weight. (*Id.*) He opined Pederzolli could lift and carry fewer than 10 pounds. (*Id.*)

2. The ALJ's Consideration

The ALJ gave "[l]ittle weight" to Dr. Grove's opinions. She stated that Dr. Grove's opinions were "significantly more restrictive than opinions made by other acceptable medical sources, including [Pederzolli's] treating orthopedist, a consultative examiner, and two State Agency physicians." (A.R. 1703.) The ALJ explained that Dr. McLean's opinion, as Pederzolli's treating orthopedist, put him "in the best position to accurately ascertain the limitations stemming from [Pederzolli's] physical problems." (*Id.*) Moreover, the ALJ questioned the reliability of Dr. Groves progress notes "in light of [Pederzolli's] efforts to obtain narcotics prescriptions and treating doctor's comments about [Pederzolli's] pain behaviors." (*Id.*) The ALJ also noted perceived inconsistencies between Dr. Grove's opinions and other statements Dr. Grove made. Finally, the ALJ determined the laboratory findings and clinical signs didn't support Dr. Grove's opinions.

3. <u>Analysis</u>

Pederzolli contends the ALJ improperly discounted Dr. Grove's medical opinions. Although Pederzolli employs a shotgun approach on this issue, scattering numerous arguments throughout his brief, the Court discerns at least five such assignments of error: (1) the ALJ selectively cited "isolated portions of the record"; (2) the ALJ incorrectly assumed, based on the fact he didn't always exhibit a nonantalgic gait or need an assistive device, that he couldn't be significantly limited in his walking and standing abilities; (3) Dr. Grove's medical opinion was entitled to increased weight because he treated Pederzolli more than any other doctor; (4) the ALJ displayed "an insufficient understanding of medical treatment and terminology"; and (5) the ALJ improperly accused Pederzolli of malingering. (Doc. 19 at 14-20.)

The Court concludes the ALJ didn't err by rejecting portions of Dr. Grove's medical opinions. As an initial mater, it is important to note that Dr. Grove's medical opinions conflicted with those of Dr. McLean. Because both doctors served as Pederzolli's treating physicians, the ALJ could reject one of their opinions without providing specific and legitimate reasons. *See e.g., Burke v. Colvin*, 2016 WL 8738224, *4 (S.D. Cal. 2016) ("If, however, a treating physician's opinion is contradicted by another treating physician, the ALJ does not need to provide specific and legitimate reasons."); *Green v. Colvin*, 2013 WL 1281750, *7 (E.D. Cal. 2013) ("Where, as here, the ALJ is presented with conflicting medical opinions of equal weight, the ALJ may resolve the conflict and need not provide specific and legitimate reasons.").

Nevertheless, the ALJ provided reasons for rejecting Dr. Grove's medical opinions regarding the extent of Pederzolli's limitations that are specific and legitimate. For example, the ALJ explained that Dr. Grove's medical opinions were "significantly more restrictive" than other acceptable medical sources, including Dr. McLean—who, as Pederzolli's treating orthopedist, "was in the best position to accurately ascertain the limitations stemming from [Pederzolli's] physical problems." (A.R. 1703.) Although Pederzolli contends the ALJ should have placed more stock in Dr. Grove's opinions,

because Dr. Grove met with him more often and specialized in pain management, it was rational for the ALJ to choose to credit Dr. McLean's opinions—Dr. McLean is an orthopedic specialist and the disability claim in this case arises from Pederzolli's back issues—and it would be improper for this Court to second-guess that determination. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). Additionally, the ALJ explained that Dr. Grove's treating records in recent years "contain more significant abnormalities, especially repeated findings of positive straight leg raise" than the records of other treating and examining doctors. (A.R. 1699.) For example, on numerous occasions, Dr. Grove made findings of positive leg raise (*e.g.,* A.R. 1579, 1582, 2017), whereas other doctors, including Dr. McLean, made negative findings of straight leg raise during similar time periods (*e.g.,* A.R. 1920, 2006). Thus, the ALJ didn't err by rejecting Dr. Grove's medical opinions.

II. <u>Pederzolli's Symptom Testimony</u>

Pederzolli argues the ALJ committed several errors when rejecting his symptom testimony. Among other things, Pederzolli argues the ALJ: (1) incorrectly rejected his testimony about standing and walking limitations because he didn't continuously exhibit a nonantalgic gait or use an assistive device; (2) "omit[ted] numerous abnormal findings and misinterpret[ed] certain medical terminology"; (3) erroneously determined that medical professionals believed he was overstating his level of pain; and (4) incorrectly determined his daily activities weren't consistent with his symptom testimony. (Doc. 19 at 20-24.)

A. **Legal Standard**

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina*, 674 F.3d at 1112 (citation omitted). "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (citations and internal quotation marks omitted).

Here, the ALJ determined that Pederzolli satisfied this first step. (A.R. 1697 ["[T]he undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms . . . ."].)

If the first step is satisfied, and "there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Molina*, 674 F.3d at 1112 (citations and internal quotation marks omitted). Here, the ALJ didn't find evidence of malingering, so she was required to provide specific, clear and convincing reasons to reject Pederzolli's testimony.

"A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (citation and quotation marks omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citation omitted); *see also Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."). "[P]roviding a summary of medical evidence in support of a residual functional capacity finding is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Brown-Hunter*, 806 F.3d at 494. Additionally, the ALJ must "elaborate on *which* daily activities conflicted with *which* part of Claimant's testimony." *Burrell*, 775 F.3d at 1138.

B. **Pederzolli's Testimony**

At the 2016 administrative hearing, Pederzolli testified that he suffers from various symptoms that could limit his RFC. Pederzolli claimed that he can only stand or walk for approximately 20 minutes at a time, and then he needs to sit or lie down. (A.R. 1724-1725.) Further, he testified he can alternate sitting and standing for one to two hours, but after that he needs to lie down. (A.R. 1725.)

- 13 -

Pederzolli also testified that he is able to do chores around the house, as long as they aren't below his waist. (A.R. 1721.) However, after 30 minutes to an hour of chores, Pederzolli stated he needs to lie down for 15 minutes before he can resume. (A.R. 1726.)

Additionally, Pederzolli claimed he can't walk further than a block or so and can't lift more than 15 pounds. (A.R. 1725.) He testified that since his injury, the most he has been outside his house is four hours at a time. (*Id.*) Pederzolli stated that if he is out of his house for four hours, he "can feel the effects [of the increased back pain] for days." (A.R. 1730.) Finally, Pederzolli testified that he can't sleep for more than four to six hours at night, so he needs to take one to two naps per day, six to seven days a week. (A.R. 1719-1720.) These naps last between one to four hours each. (*Id.*)

C.  **Analysis**

The ALJ provided specific, clear and convincing reasons for rejecting Pederzolli's symptom testimony. The ALJ explained that the objective medical evidence didn't support Pederzolli's allegations regarding the extent of his sitting, standing, and walking limitations. For instance, the ALJ cited an August 2008 statement from Dr. Zoran Maric—Pederzolli's treating orthopedist at the time—that "all along" Pederzolli's subjective pain complaints had been "somewhat out of proportion to what one would expect," and there was a "significant nonorganic component to [Pederzolli's] pain." (A.R. 1697 [citing A.R. 770].) The ALJ also noted that Dr. McLean, in 2011, determined Pederzolli had a "structurally sound spine" despite his subjective pain complaints. (A.R. 1697 [citing A.R. 923].) Further, the ALJ quoted a 2016 statement by Dr. McLean that "we are dealing with predominantly subjective pain complaints." (A.R. 1697 [citing A.R. 1995].) And the ALJ cited portions of the medical record that showed generally normal findings. (A.R. 1699, 1700 [citations omitted].)

Although an ALJ can't reject a claimant's symptom testimony "simply because the alleged severity of the pain or symptoms is not supported by objective medical evidence," *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 n.11 (9th Cir. 2007) (citation omitted), the ALJ here provided other specific, clear and convincing reasons unrelated to the objective

medical evidence.  For example, the ALJ noted that the record supported a greater walking and sitting capacity than Pederzolli had claimed.  After Pederzolli's second surgery, he told doctors on multiple occasions that he could walk 1-2 miles per day (A.R. 1700 [citing A.R. 922, 926, 974, 977, 1009].)  Dr. McLean had recommended that Pederzolli walk for exercise, which, in the ALJ's view, "suggest[ed] [Pederzolli] retained some significant ability to walk."  (A.R. 1700 [citing A.R. 833, 888, 970, 982].)  Pederzolli also testified at the hearing that he could drive to his parents' home, which the ALJ noted "took 30 minutes each way."  (A.R. 1700.)

The ALJ provided another specific, clear and convincing reason for rejecting Pederzolli's claimed sitting, standing, and walking limitations by identifying numerous records in which physicians noted improvement in Pederzolli's activity levels.  Following Pederzolli's 2008 surgery, Dr. Grove determined that Pederzolli's activity level had "dramatically improved."  (A.R. 1701 [citing A.R. 737-738].)  The ALJ observed that a "'[d]ramatically improved' activity level was repeatedly noted from the second half of 2008 through 2011."  (A.R. 1701 [citations omitted].)  Additionally, similar statements were made by Pederzolli's pain management provider between 2011 and 2014.  (*Id.* [citations omitted].)  Finally, the ALJ noted, "[o]nly since 2014 has Dr. Grove consistently noted slower functional improvement. . . [yet] Dr. Grove still characterized it as an 'improvement' rather than a decrease in functioning."  (*Id.*)

The ALJ also provided a specific, clear and convincing reason to reject Pederzolli's fatigue testimony.  The ALJ observed that Pederzolli was "repeatedly described as awake and/or alert during medical visits."  (A.R. 1701 [citing more than 20 such instances].)  The ALJ also noted that although at times Pederzolli complained of fatigue, he often denied being fatigued or didn't make complaints about fatigue.  (A.R. 1701.)  Furthermore, the ALJ couldn't identify a single instance in the medical record in which Pederzolli told a treating source that he was so fatigued he needed to take naps during the day.  (*Id.*)  *Cf. Dunn v. Astrue*, 2009 WL 1844347, *7-8 (C.D. Cal. 2009) (affirming ALJ's rejection of claimant's symptom testimony, where claimant testified at the hearing she "cried daily"

yet "never told [her doctor] she cried daily").

Finally, Pederzolli's criticisms of the ALJ's analysis don't require reversal. For example, Pederzolli contends the objective medical evidence supports work-preclusive limitations and the ALJ "omits numerous abnormal findings and misinterprets certain medical terminology." But the medical records the ALJ cited are clear—the extent of Pederzolli's pain is not supported by the objective medical evidence. Thus, although the ALJ didn't mention some abnormal findings and may have misinterpreted certain medical terminology, this doesn't change the doctors' conclusions upon which the ALJ relied. *Cf. Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (citation omitted) ("[I]n interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'").

Similarly, Pederzolli contends the statements regarding his ability to walk one to two miles per day aren't indicative of his actual abilities; instead, he claims this was "an isolated seven month period . . . not representative of [his] walking capacity throughout the entire period at issue." (Doc. 19 at 23.) However, Pederzolli doesn't cite any evidence showing that his walking ability decreased after that period. Finally, Pederzolli argues the ALJ's citation of statements recommending that he walk for exercise "are not actual activities, and there is no evidence Pederzolli could sustain a level commensurate with a work setting." (Doc. 19 at 23.) The ALJ cited the recommendations, however, for the proposition that Pederzolli retained more ability to walk than he claimed, because the doctors believed Pederzolli could walk. This inference is reasonable and convincing.[3]

III. <u>Refusal to Allow Cross-Examination</u>

Pederzolli argues the ALJ erred by relying on opinion evidence of consulting physicians but not allowing him to cross-examine them. (Doc. 19 at 24-25.)

"A claimant in a disability hearing is not entitled to unlimited cross-examination, but is entitled to such cross-examination as may be required for a full and true disclosure

---

[3] Because the reasons discussed above are sufficient to uphold the ALJ's rejection of Pederzolli's symptom testimony, the Court need not address whether some of the additional reasons identified by the ALJ were also specific, clear and convincing.

- 16 -

of the facts." *Copeland v. Bowen*, 861 F.2d 536, 539 (9th Cir. 1988). "[A]n administrative law judge . . . *may* . . . issue subpoenas" when "it is reasonably necessary for the full presentation of a case." 20 C.F.R. 416.1450(d)(1) (emphasis added). Therefore, an ALJ has discretion to decide when cross-examination is warranted. *Copeland*, 861 F.2d at 539.

Here, Pederzolli fails to articulate any particularized need for his cross-examination request. This is a somewhat unusual case in that the ALJ based her conclusions in significant part on the opinions of the claimant's treating physician, Dr. McLean, who didn't identify any limitations that would preclude Pederzolli from working. This is not, in other words, a case where the ALJ rejected all of the treating physicians' opinions and then accepted all of the consulting physicians' opinions. Furthermore, although Pederzolli argues "Dr. McLean's opinion may have been interpreted differently" if "other opinions [had] been deemed unreliable through cross-examination," this argument is based on speculation. (Doc. 29 at 14.) Pederzolli doesn't identify any areas of inquiry in which cross-examination would be necessary, "such as a question of witness bias, an issue as to [the consultants'] expertise, or the foundation for [the consultants'] opinion[s]." *See Abrar v. Sec'y of HHS*, 1992 WL 389004, *4 (C.D. Cal. 1992). Nor does Pederzolli explain how a failure to allow cross-examination prevented full and true disclosure of the facts. Thus, Pederzolli hasn't demonstrated the ALJ committed reversible error.

IV.     Step 5

Pederzolli argues the ALJ accepted job numbers that were overstated by the vocational expert and improperly denied his request for production of the documentation on which the vocational expert relied. (Doc. 19 at 25-28.) In response, the Commissioner argues Pederzolli forfeited any objections to the vocational expert's job numbers because Pederzolli didn't raise an objection at any point before now. The Commissioner notes Pederzolli failed to object to the vocational expert's job numbers during the 2013 administrative hearing, in front of the Appeals Council in 2015, during his first appeal to this Court in 2015, during the remand hearing in 2016, or in front of the Appeals Council in 2017. (Doc. 22 at 14-15.) In his reply, Pederzolli argues that he preserved the issue by

filing a subpoena request before the 2013 administrative hearing. Additionally, Pederzolli contends that he couldn't have objected during the post-remand proceedings because no vocational expert testified at the remand hearing and the ALJ relied upon the testimony from the previous, vacated hearing. Thus, Pederzolli argues, he didn't forfeit the argument because "[c]ounsel could not reasonably anticipate that the ALJ [would] use job numbers from the first hearing [to] deny[] the claim on re-hearing." (Doc. 29 at 14-15.)

On the one hand, the Court agrees with the Commissioner that Pederzolli forfeited his right to challenge, during the proceedings in *this* Court, the inaccuracy of the vocational expert's job numbers. Pederzolli's generic subpoena request for documentation didn't constitute an objection to the vocational expert's job numbers. Pederzolli issued the subpoena request before the vocational expert produced any job numbers, so it is difficult to understand how the subpoena could constitute an objection to them. The Court is also unpersuaded by Pederzolli's argument that, during the post-remand hearing, he couldn't "reasonably anticipate that the ALJ [would] use job numbers from the first hearing." At remand hearings, where there has been no change in residual function capacity, ALJs regularly rely on the testimony of the vocational expert from the prior hearing. Courts have repeatedly determined this is permissible.[4] Thus, there is no need to deviate from the normal rule that "when a claimant fails entirely to challenge a vocational expert's job numbers during administrative proceedings before the agency, the claimant forfeits such a challenge on appeal, at least when that claimant is represented by counsel." *Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2017).

On the other hand, it should be noted that this case is being remanded to the ALJ for

---

[4] *See e.g., Paulson v. Astrue*, 368 Fed. App'x 758, 760 (9th Cir. 2010) ("We first hold that the ALJ did not err by relying on the testimony of vocational expert Wilson from a prior hearing before a different ALJ . . . [because] . . . nothing he reviewed on remand warranted modifying [the different ALJ's] prior RFC findings and that those findings should remain unchanged."); *McKnight v. Astrue*, 340 Fed. App'x 176, 181 (5th Cir. 2009) ("Since the ALJ did not change his RFC assessment after remand, the ALJ's failure to initiate new hearings or submit the vocational expert to renewed cross-examination is not prejudicial because the vocational expert's interrogatories had been entered into the record without objection from the claimant."); *Douglas v. US Soc. Sec. Admin.*, 2016 WL 5660315, *12 (D.N.H. 2016) (same).

further proceedings. Those proceedings may well involve further testimony from the vocational expert concerning whether the occupations of microfilming document preparer, addresser, and surveillance systems monitor require repetitive overhead work or work on uneven ground. Thus, there may be an opportunity for Pederzolli to seek clarification from the vocational expert concerning the job numbers.[5]

V.     Scope of Remand

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017). This applies particularly "[i]f additional proceedings can remedy defects in the original administrative proceeding." *Garrison*, 759 F.3d at 1019 (citation omitted). But there is an exception to this rule, known as the "credit-as-true" rule, under which the court may remand with instructions to calculate and award benefits. For this rule to apply, a three-part test must be satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

Here, the credit-as-true rule isn't satisfied. The only reversible error committed by the ALJ was failing to provide reasons for rejecting Dr. McLean's opined limitations regarding Pederzolli's ability to perform repetitive overhead work and work on uneven ground. Even if these limitations are taken as true, the ALJ wouldn't necessarily be required to find Pederzolli disabled—it's possible that Pederzolli could still perform the occupations of microfilming document preparer, addresser, and surveillance systems monitor. It's also possible there are other occupations Pederzolli could perform with those limitations.

---

[5] Pederzolli also argues the ALJ erred by not requiring the vocational expert to produce the documentation upon which his opinion was founded. Pederzolli devotes only three sentences to this argument, none of which cite a case that supports Pederzolli's conclusion. Further, Pederzolli doesn't address this argument in his reply brief. Because Pederzolli didn't develop this argument, the Court won't address it. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008).

- 19 -

Additionally, further administrative proceedings could be useful to determine whether Pederzolli is, in fact, unable to do repetitive overhead work and work on uneven ground (and if so, whether he is still capable of performing an occupation existing in a significant number in the national economy) and in obtaining more detail about the job numbers provided by the vocational expert.

Accordingly, **IT IS ORDERED** that the final decision of the Commissioner of Social Security is **vacated**, and this case is **remanded** for further proceedings consistent with this opinion. The Clerk shall enter judgment accordingly and **terminate** this case.

Dated this 15th day of March, 2019.

_____
Dominic W. Lanza
United States District Judge